KISINGER–ISON CO. v. BRADFORD BELTING CO. [1]

(Circuit Court of Appeals, Sixth Circuit. October 3, 1899.)

No. 653.

1. PATENTS—ANTICIPATION—WIRE CONNECTIONS.
    The Kisinger patent, No. 492,811, for a trolley-wire connection, is void for anticipation by the device for connecting fence wire described in the Morrison patent, No. 428,123.

2. SAME.
    The Morrison patent, No. 428,123, for a fence-wire coupling, which consists of a hollow shell with the bore larger at the center, into which there is an opening through which serrated wedges are inserted, which form a lock, preventing the withdrawal of the ends of the wires when they are inserted at either end of the shell, shows an invention not anticipated by anything in the prior art, and is valid.

[1] Rehearing denied November 20, 1899.

**3. SAME—INFRINGEMENT.**

Such patent is infringed by the device shown in the Gerard & Lawrence patent, No. 575,641, which is similar to that described in the Morrison patent, except that, instead of one serrated wedge in each end of the shell, two are used, the larger ends of which are connected by a bow-shaped spring, which renders them self-locking when the end of the wire is forced between them.

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is an appeal from a decree dismissing a bill filed by the Kisinger-Ison Company, complainant, against the Bradford Belting Company, to enjoin the infringement of two patents,—one No. 428,123, granted to D. B. Morrison, May 20, 1890, for a fence-wire coupling, and No. 492,811, granted to W. S. Kisinger, March 7, 1893, for a trolley-wire connector. The appellant first owned the Kisinger patent alone, and operated under a license from the owner of the Morrison patent, and finally purchased the Morrison patent. The description of the Morrison patent, with the accompanying drawings, is as follows:

"A represents a hollow shell, larger at its middle portion, and tapering slightly from its central portion towards its opposite ends. It is provided with an opening, a, at its central portion, for the purpose of giving access to its interior. Its opposite ends, as shown at a', are sufficiently large to admit therein, with a free, sliding movement, the end or ends of the single or double or more strands of the wire to be united. Small balls, B, of hard metal, are provided, which serve to form the lock for preventing the withdrawal of the ends of the wire from the casing or shell, A, or wedge-shaped pieces (see Fig. 4), provided with teeth slanting towards the larger portion of the shell, may be employed. The coupling is adjusted as follows: The ends of the wire having been inserted in the opposite ends of the shell, A, and by any suitable purchase or strain having been brought as nearly together as possible or convenient centrally within the shell, one of the small metallic balls or wedge-shaped pieces is slipped within the casing or shell alongside of the ends of the wire towards

each end of the shell, until it begins to wedge between the shell and wire, when the strain is allowed to take effect upon the wire, the result being to crowd the metallic locking device between the shell and wire, and roll or slide it towards the small end of the shell, thereby so effectually jamming it between the wire and shell as to form a positive and effective lock, the effectiveness of which will be increased as the strain upon the wire is increased. In operation the ends of the wire are each inserted through the end openings of the shell, and the locking devices, which are then placed within the shell, may be caused to slightly bind the ends of the wire by forcing said locking devices towards the tapered ends of the shell by a rod, or any other means may be employed for this purpose. After the locking devices have once begun to bind the wires, all strain upon or contraction of the wires will tend to more securely lock their ends to the shell. This simple device requires but a moment's time for its adjustment, and may be readily removed if for any purpose it shall be found desirable, while at the same time it forms a neat finish and can be furnished at a trifling expense. Having thus fully described my invention, what I desire to secure by letters patent is the herein-described wire-coupling device, consisting of a shell having its ends tapered, and formed with openings to receive the ends of the wires, and removable locking devices, each located in the tapered end of said shell to engage the end of each wire, substantially as set forth."

The Kisinger patent is shown in Fig. 4, below:

KISINGER
FIG. 4.

It is the same as the Morrison patent, except that two wedges are used instead of one. The first claim of the patent was for the combination, in a coupling for wires, etc., of a tube having converging ends, and a set of bodily detachable keys, whose outer edges are tapered, and their inner edges provided with teeth, for the purpose described. The infringing device, which is made under a patent to Gerard & Lawrence, No. 575,641, and dated January 19, 1897, may be understood from Fig. 1 of the drawings, and Fig. 6, which shows the two serrated wedges united by a spring.

The second claim of this patent is as follows: "(2) A wire coupling, consisting substantially of a sleeve having two bores, one entering at each end, and both centrally in line with each other, two serrated jaws in each bore held therein prior to their engagement with a wire end, and in proper position for the purpose of enabling such engagement by spring pressure, and openings in the sleeve to permit introduction of these jaws." The openings designated as Fig. 10 are shown in Fig. 2 of the patent.

The usual defenses of invalidity by reason of want of novelty and anticipation, and of noninfringement, were pleaded. The circuit court held that both the Kisinger and Morrison patents were void for want of invention.

George J. Murray, for appellant.

E. E. Wood and Wm. R. Wood, for appellee.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). We concur with the circuit court in the view that the Kisinger patent is invalid. It is a mere duplication of the serrated wedge of the Morrison patent, and is an improvement which does not involve any

patentable invention. The only real questions in the case are as to the validity and infringement of the Morrison patent by the defendant's device. The circuit court thought that the prior art was so full of devices resembling the Morrison patent as to require it to hold that there was no invention in that patent. It is undoubtedly true that there were many patents for uniting the ends of a broken wire which embodied the element of the hollow sleeve, into which the two broken ends were introduced, and were locked into the sleeve by devices either for enlarging the ends of the wire, or for locking the ends of the wire inside the sleeve or outside the opposite end thereof. The earliest of these is the Cary patent, Fig. 2 of which is given below:

CARY
Fig. 2

The ends of the wires were there inserted in parallel lines in the sleeve, the end of each being bent around the end of the opposite end of the sleeve, and the wires being further secured by driving a pivot between the two.

The Anderson patent, Fig. 2 of which is below, was like this in principle, except that the wire was not extended to the other end of the sleeve, and was not bent around the end of it:

ANDERSON
Fig. 2.

In the Ellis patent the locking device was a bending of the wire itself after it had been inserted in the sleeve, as it may be seen from Fig. 1 in the Ellis patent:

ELLIS  FIG. 1.

The Bainbridge patent, seen in Fig. 1 below, shows a bending of the wire at right angles in a tube running up from the sleeve, and the insertion of a wedge between the two wires:

BAINBRIDGE
Fig. 1.

The Ball and Lane patents show bending of the wires:

BALL

LANE

*Fig. 3.*

Another form was that of G. & E. Woods' English patent, in which the ends of the wire were inserted between two semicircular shaped pieces of metal provided with a screw thread on the outside. The pieces of metal were brought together or clamped by means of nuts or their equivalent. Fig. 1 of this patent will explain its principle:

## WOODS & WOODS FIG. 1.

The device most relied on by way of anticipation is the Carpenter patent, Fig. 2 of which is given below. In the operation of this device the end of the wire must be split, and after it has been inserted in the sleeve, which is made up of two pieces divided in the middle, a wedge is inserted in the split ends, and then the two parts of the sleeve are united by a right and left hand screw which holds the wedge between the two split ends of the wire:

## CARPENTER.

*Fig. 2.*

The evidence seems to show that the Kisinger patent was the first device practically used for joining broken ends of the trolley wire in which it was not necessary to insert molten metal, like solder, in order to secure the requisite tensile strength. The bending of a thick trolley wire for the purpose of locking the wire into the sleeve

is impracticable. The operation to be performed is one which requires great expedition, and the simpler the tools to be used the better the device. Any device, therefore, which dispenses with the necessity of either splitting the end of the wire or bending the wire and using molten metal to secure strength is a marked improvement. This must be obvious from everyday observation of the repair of the trolley wire upon the street. Most of the devices to which reference has been made, and which are relied on as anticipations of the Morrison patent, require a bending of the wire, with the disadvantage for trolley-wire use already stated. Others of the alleged anticipations require that there should be enough slack in the trolley wire, the broken ends of which are to be united, to permit the ends thereof to be drawn past each other and lie parallel in the sleeve. This requirement necessitates the addition of new wire and the use of two joints. The Morrison device does not require the broken ends to lie parallel to each other. Indeed, they may be separated by at least half of the length of the sleeve. Several of the devices are clearly wanting in tensile strength for trolley-wire purposes. This is true of the Carpenter patent, and probably, also, of the Woods patent. The Woods patent is not adapted for trolley-wire purposes, for the further reason that the bolts used in clamping the wire in the sleeve would interfere with the smooth running of the trolley as it passes along the wire. On the whole, the use of the serrated wedge in the Morrison patent seems to us to be a distinct improvement on all of the devices which went before, both in the tensile strength effected by the biting of the wedge into the wire, the ease with which the locking device is adjusted, and the simplicity of the structure. It is not a pioneer or primary invention, but its successful use proves it to be a step in the art sufficiently meritorious to warrant the monopoly of the patent. It is true that the wedge is a well-known mechanical device, both for splitting and separating material, and for locking, but that fact does not prevent the patenting of everything which involves the application of the wedge principle. It is true, also, that the use of the roughened surface or of the serrated surface to increase the tensile power of this union did not involve great inventive genius. Still, the use of the wedge and the serrated surface in the tapered sleeve formed a combination which was peculiarly adapted to the purpose of holding trolley wires together where there had been a break. The line between mechanical ingenuity and invention is sometimes very hard to draw. It is a question of fact, and one upon which the opinions of men differ. In the present case this court differs from the court below, and holds invention to be present in the Morrison device. As already stated, the Kisinger device is a mere duplication of the serrated wedge in the combination, and did not involve invention.

The remaining question is, does the defendant's device infringe the Morrison patent? We think it does. It consists of a shell having its ends tapered and formed with the openings to receive the ends of the wires, and removable locking devices, each located in the tapered end of said shell to engage the end of each wire. These are the elements set forth in the claim of the Morrison patent. Defendant

uses exactly the same locking device as Morrison, to wit, the serrated wedge. Two of these wedges are used as in Kisinger's patent, and they are united by a spring. This is possibly an improvement, enabling the repairer to adjust the wedges by the mere insertion of the wire, instead of pounding them in, as in the Morrison and Kisinger devices. But the wedges are removable quite as much as in the Morrison patent, in the sense that the wedge is easily removed in the sleeve from the point of union, and will then be available for a second union of the same kind. Moreover, the patent under which the defendant manufactures its device shows a hole through which the double serrated wedge with the spring connection may be entirely removed from the sleeve. In actual operation it is not necessary to remove the wedge from the sleeve, because it is self-adjusting and removes itself when the wire is pushed in, and pushes itself into locking operation when the wire is pulled. The defendant's device, therefore, though it involves additional elements, involves every element present in the Morrison coupling. The decree of the circuit court is in part reversed and in part affirmed, with directions to enter a decree for the complainant, finding that the Morrison patent is infringed by the defendant company, and enjoining future infringement, and for a reference on the question of damages. In so far as the decree of the circuit court found the Kisinger patent invalid and dismissed the bill as to it, the decree is affirmed. The costs of appeal are taxed against the appellee.